UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
WALRUS MASTER FUND LTD.,

                Plaintiff,          Case No.:08-cv-02404 (DAB)

      -against-

CITIGROUP GLOBAL MARKETS, INC.,

                Defendant.

------------------------------------x

# MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS OF DEFENDANT CITIGROUP GLOBAL MARKETS INC.

SADIS & GOLDBERG LLP
Attorneys For Plaintiff
551 Fifth Avenue, 21st Floor
New York, NY 10176
(212) 947-3793

## PRELIMINARY STATEMENT

CGMI's main argument is that Walrus cannot sue under the Commodity Exchange Act because Walrus was not a party to the licensing agreement for the Trading Technologies Software. This argument withers under the facts that (1) neither the CEA nor any other claim in the Complaint requires Walrus to be a party to the TT licensing agreement in order to bring a claim; and (2) even if there were such a requirement, the documents attached to the Complaint and CGMI's Declaration establish that Walrus was an authorized third party under the licensing agreement.

Of all elements of Walrus's common law fraud and CEA fraud claims, CGMI challenges only scienter. The Court should reject this challenge, because it improperly relies on a heightened pleading standard from the Private Securities Litigation Reform Act, which is inapplicable to this case, which does not involve a claim regarding securities or securities fraud. The challenge also fails because Walrus pinpoints the date, time, and content of the fraudulent misrepresentation, and provides—and attaches to the Complaint—documentary evidence indicating that CGMI was at least reckless in misrepresenting the facts regarding the disputed trade of August 17, 2007.

## STATEMENT OF FACTS

Walrus's portfolio manager, Exis Capital Management, Inc. ("Exis") entered into a License Agreement (the "License Agreement")[1] with CGMI on October 18, 2005. The License Agreement granted a license to Exis to use the TT software system.

The "Use of Service" portion of the License Agreement required Exis to use TT only for Exis's own accounts or for the accounts of third parties who had provided Exis with "written

---

[1] A copy of the License Agreement is annexed to the Declaration of Joellen R. Valentine as Exhibit 1.

2

authorization to enter orders for their account(s) if [Exis had] provided CGMI with evidence of such authorization" satisfactory to CGMI. See License Agreement, section 3.

Walrus specifically authorized Exis in writing to enter orders for Walrus's accounts, in Part III of the Institutional Futures Account Agreement, entitled "Authorization for Account Manager"[2]. The authorization was a form provided by CGMI as part of its standard "Institutional Futures Account Agreement and Forms". The authorization is signed by Walrus and dated October 18, 2005, the same day as the remainder of the IFAA and the License Agreement[3].

Until the filing of this motion to dismiss, CGMI never communicated any objection to Exis or Walrus regarding the form of the written authorization or to Walrus's use of the TT software. On the contrary, CGMI accepted thousands of orders from Walrus for over two years through the TT software.

The License Agreement also required that, if any third party was to have its orders entered by Exis into TT, that third party would have to enter into an IFAA with CGMI, and keep that IFAA in force. Walrus entered into an Institutional Futures Account Agreement with CGMI on or about October 18, 2005. See p.8, IFAA; Complaint, ¶12. The IFAA states on page 3 that it is between CGMI and "Customer", and on page 8, under "Customer", it says "Name of Customer: Walrus Master Fund, Ltd.". Walrus kept this agreement in force until CGMI terminated it in fall 2007.

CGMI incorrectly states that "[d]uring the seconds in which the trade at issue was allegedly entered and confirmed, the only conduct attributed to CGMI is that CGMI 'confirmed to Walrus that the order had been executed'", and that "Walrus alleges that this representation

---

[2] See IFAA, p. 12 of 19, annexed to Complaint as Exhibit A.
[3] See IFAA and License Agreement.

3

was false". CGMI cites paragraph 53 of the Complaint for Walrus's allegation. But as demonstrated by paragraph 53 of the Complaint, as well as paragraph 52, this is not Walrus's allegation. Instead, the Complaint alleges that CGMI falsely represented to Walrus that CGMI had executed the Disputed Trade at an average price of 1470.00. This false representation occurred on August 20, 2007, days after the Disputed Trade had taken place.

The Complaint asserts that on August 17, 2007, Walrus used TT to instruct CGMI to buy 250 S&P Minis, at a price no greater than 1439.75. See Complaint, ¶s 18, 34. Although Walrus initially received confirmation that CGMI had followed instructions, CGMI in fact refused to honor this limit order and instead represented to Walrus that CGMI had executed the trade at an average price of 1470.00. See Complaint, ¶s 45, 52. The Complaint charges that CGMI's failure to follow Walrus's instructions was knowing and intentional. See Complaint, ¶s 50, 54, 55.

## STANDARD OF REVIEW

### *Fed.R.Civ.P. 12(b)(6)*

The purpose of a motion to dismiss under Fed.R.Civ.P. 12(b)(6) is to "test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits". Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006)(emphasis in original). On such a motion, the court "assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it". Id.

The court must "accept as true all of the factual allegations set out in the plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally". Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001). Any documents "attached to the complaint or incorporated in it by reference are deemed part of the

4

pleading and may be considered" on a motion to dismiss. Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007).

***Fed.R.Civ.P. 9(b)***

Fed.R.Civ.P. 9(b) states that in pleading fraud, "malice, intent, knowledge, and other condition of mind of a person may be averred generally". As CGMI concedes, a complaint satisfies Rule 9(b)'s particularity requirement merely by (a) adequately specifying the statements that it claims were false or misleading; (b) giving particulars as to the respect in which the statements were fraudulent; (c) stating when and where the statements were made; and (d) identifying those responsible for the statements. See Fed.R.Civ.P. 9(b); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).

While Rule 9(b) requires plaintiffs to support allegations of scienter with facts giving rise to a "strong inference" of fraudulent intent, a plaintiff need not demonstrate a defendant's motive to commit fraud, as long as the plaintiff "adequately identifies circumstances indicating conscious behavior", Cosmas at 13, or recklessness by the defendant, CFTC v. Int'l. Financial Services, Inc., 323 F.Supp.2d 482, 502 (S.D.N.Y. 2004); Drexel Burnham Lambert Inc. v. CFTC, 850 F.2d 742, 748 (D.C. Cir.1988); accord, Crothers v. CFTC, 33 F.3d 405, 411 (4th Cir. 1994); accord, CFTC v. Savage, 611 F.2d 270, 283 (9th Cir. 1979).

A plaintiff properly pleads scienter in a claim under §4(b) of the Commodity Exchange Act ("CEA") by alleging "defendant's statement that a fact exists or an event will come to pass coupled with allegations that the fact did not exist or the event did not occur, and circumstances indicating that the statement was false when made". See Karasyk v. Marc Commodities Corp., 770 F.Supp. 824, 829-830 (S.D.N.Y. 1991).

Contrary to CGMI's argument, there is no basis to apply the heightened standard of the Private Securities Litigation Reform Act ("PSLRA") to claims under the CEA. This heightened standard would require a plaintiff to demonstrate that an inference of fraudulent intent is "at least as compelling" as any opposing inference of nonfraudulent intent. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007)

The PSLRA was a specific response to the deluge of private class actions filed under §10(b) of the Securities Exchange Act of 1934, and was designed to "curb perceived abuses" of those actions, which abuses have included "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers". See Tellabs at 2508.

In contrast, this matter does not include any securities fraud claim, under §10(b) or any other section. It does not even involve a claim regarding securities, and there is no logical reason to apply the heightened pleading standard of the PSLRA to a CEA claim regarding a futures contract. Indeed, Congress could have easily extended the PSLRA heightened standard to CEA claims, but did not do so, evidencing its intent that the heightened standard is not to be applied to the CEA. .

The Court should disregard the class action In re Crude Oil Commodity Litig., 2007 WL 1946553, *1 (S.D.N.Y., Jun. 28, 2007), the only CEA case that CGMI cites in support of its heightened pleading argument, for three reasons. First, the case cites no authority linking the PSLRA's goal with any aspect of the plaintiffs' CEA claims, but instead vaguely concludes that private securities fraud actions can impose "substantial costs" on companies and individuals who are acting lawfully, and that courts should require specificity before allowing a "potentially massive factual controversy to proceed". The court simply engaged in judicial legislation. See Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 332 F.3d 116, 127 (2d Cir. 2003)

(declining to find Congressional silence indicative of "clear statutory command", since "[i]t is not [the court's] place as jurists to supply that which is omitted by the legislature"). Second, In Re Crude Oil involved sections of the CEA not at issue in this §4(b) false-statement case, namely market manipulation under §§ 9(a) and 22(a). Third, this matter, unlike In Re Crude Oil, is not a class action. None of CGMI's other cited cases on this issue are CEA cases, and thus the Court should ignore them.

## POINT I
## WALRUS IS A PROPER PLAINTIFF IN THIS LITIGATION

1. *None of the Complaint's claims arise under the License Agreement, so the status of Walrus under that agreement is a red herring.*

Walrus does not plead breach of the License Agreement, or breach of any other contract. Moreover, none of the four claims in the Complaint contain any requirement that there be a valid licensing agreement, or that Walrus be a party to any licensing agreement. For example, nothing in the CEA requires Walrus to be a party to the TT licensing agreement in order to bring a claim. The License Agreement simply has no bearing on any of Walrus's claims, and the Court need not determine Walrus's status under that agreement.

Nor does CGMI's citation to Texas Liquids Holdings, LLC v. Key Bank Nat'l Assoc., 2007 WL 950136, *1 (S.D.N.Y., Mar. 27, 2007), bolster its position, because unlike this matter, that case involved (a) breach of contract and other contractual claims; (b) no claim under the Commodity Exchange Act; and (c) a fraud claim based entirely upon the purported breach of contract.

2. *Even if Walrus were required to be an "authorized third party", it would be one, under both conditions in the License Agreement.*

CGMI argues that Walrus, "standing on its own", is not a proper party to this matter because if it placed its trade through TT directly, it did so without a license, and therefore has no

"legal grounds" to complain about the execution of the Disputed Trade. This argument relies on the premise that Walrus has not pleaded that it was an "authorized third party" under its account manager Exis's license agreement governing the use of TT. But as CGMI states on page 3 of its memorandum in support of this motion, in order to be an authorized third party, Walrus would need only to (1) provide Exis with written authorization to enter orders for Walrus's account and (2) execute a "Futures Clearing Agreement" with CGMI.

Walrus has indisputably satisfied both of these conditions, as demonstrated by the IFAA, Exhibit A to the Complaint[4]. The first condition appears in section 3 of the License Agreement, requiring "written authorization to enter orders for [Walrus's] account(s) if [Exis had] provided CGMI with evidence of such authorization" satisfactory to CGMI. Walrus satisfied that condition by providing its written authorization, in Part III of the IFAA, entitled "Authorization for Account Manager". This authorization—along with the entire IFAA—is annexed to the Complaint as Exhibit A.

CGMI cannot contend that it was not provided evidence of the authorization, since the authorization was provided to CGMI on the same day and at the same time as all other parts of the IFAA and the License Agreement, on October 18, 2005. Nor can CGMI object to the form or sufficiency of the authorization as anything less than "satisfactory", since it was a pre-printed form that CGMI provided to Walrus and Exis as part of the License Agreement, wherein Walrus needed only to fill in the blanks with its name and signatory, the name of its account manager, and the date. And CGMI has never objected to the authorization or purported lack thereof until now. Rather, CGMI allowed Walrus to use TT for its trading for over two years.

---

[4] As stated above, any documents "attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered" on a motion to dismiss. Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007). Thus, the Court should consider the IFAA as part of the Complaint for purposes of this motion.

As for the second condition, Walrus satisfied it, too. Again, annexed to the Complaint as Exhibit A is the IFAA, executed by "Customer", which is identified on page 8 as Walrus. The IFAA remained in effect until CGMI canceled it in fall 2007. Notably, the Complaint specifically pleads that Walrus entered into this agreement with CGMI[5]. Thus, this condition cannot be a basis to dismiss the Complaint.

## POINT II
## THE COURT SHOULD SUSTAIN THE FRAUD AND CEA CLAIMS BECAUSE WALRUS PROPERLY ALLEGES INTENT AND WILLFUL MISCONDUCT

To plead common law fraud under New York law, Walrus must allege false representation, scienter, materiality, expectation of reliance, justifiable reliance, and damages. CreditSights, Inc. v. Ciasullo, 2007 WL 943352, *1, *11 (S.D.N.Y., Mar. 29, 2007). As for Walrus's claim under CEA §4(b), Title 7 U.S.C. § 6b(a) makes it unlawful "for any person, in or connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person ... (i) to cheat or defraud or attempt to cheat or defraud such other person; ... (iii) willfully to deceive or attempt to deceive such other person...."

To establish a violation of the CEA's anti-fraud provisions, a plaintiff must prove "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality."; See CFTC v. AVCO Financial Corp., 28 F.Supp.2d 104, 115 (S.D.N.Y.1998), aff'd in relevant part sub nom. CFTC v. Vartuli, 228 F.3d 94, 101 (2d Cir.2000) ; see also CFTC v. R.J. Fitzgerald & Co., 310 F.3d 1321, 1328 (11th Cir.2002).

CGMI evidently concedes that Walrus has adequately pleaded all elements of both the fraud claim and the CEA claim, except for scienter, the only element that CGMI's papers challenge. As set forth below, Walrus has adequately pleaded scienter.

---

[5] See Complaint, ¶12.

9

### *1.  Walrus has alleged circumstances demonstrating that CGMI was at least reckless in violating CEA §4(b).*

In Reddy v. CFTC, 191 F.3d 109 (2d Cir. 1999), the Second Circuit Court of Appeals upheld findings of scienter under CEA §4(b), where "audit trail irregularities" suggested "artificial trading", thus supporting the plaintiff's claim that the defendant had "knowingly" participated in bucketing orders. See id. at 118-119. Notably, although Reddy was decided after the PSLRA was enacted in 1995, the Reddy court did not weigh alternative nonfraudulent explanations for these audit trail irregularities to determine if they were more compelling than the explanation of fraud. Finally, the Reddy court expressly held that motive was not an essential element of a CEA §4(b) case. See id. at 119.

Similarly, in Rotter v. Institutional Brokerage Corp., 1994 WL 389083, *1 (S.D.N.Y., Jul. 22, 1994), the court denied a defendant brokerage firm's Rule 9(b) motion to dismiss the plaintiff customer's claims of common law fraud and CEA §4(b), where plaintiff alleged that he had placed an order with defendant, then received confirmation of the price at which his order had been initially placed, and finally learned that his actual execution price was different from the initial price that the defendant had stated to him. See id. Quoting the requirement for the plaintiff to allege facts giving rise to a "strong inference" of fraudulent intent, the court found the complaint adequate for Rule 9(b) purposes, since it detailed the precise time and exact prices for each order, the position of the defendants and their connection to him, and the "timing and wording" of the transaction in question. See id. at *3.

The Complaint in this case, as in Reddy and Rotter, properly pleads intent under Rule 9(b). Walrus pleads that CGMI bucketed its limit order with respect to S&P Minis and then later fraudulently represented the average execution price for that order, as demonstrated by irregularities in the Audit Trail. These irregularities include data demonstrating that the average

10

execution price for Walrus's limit order of 1439.75 was well above the limit price, namely at 1470.00. The Complaint charges that CGMI's actions were knowing and intentional. See Complaint, ¶s 50, 54, 55. As in Reddy, this Court should decline to apply the PSLRA standard of pleading to this case. Taking the allegations as true and interpreting them in the light most favorable to Walrus, the Court should credit the Complaint's allegations regarding scienter and deny CGMI's motion in its entirety.

While CGMI argues that Walrus's scienter allegations amount to nothing more than the "parading of jargon", the Court should reject this argument, because the Complaint's allegations contain all necessary elements under Cosmas v. Hassett, 886 F.2d 8 (2d Cir. 1989). The Complaint specifies the false and misleading statements, namely the Audit Trail that CGMI provided to Walrus on August 20, 2007. Next, the Complaint gives particulars in paragraphs 43 to 46 regarding how the statements were fraudulent, namely that they clashed with the actual sequence of events of August 17, 2007 in that (a) the Audit Trail claimed that Walrus trader Andrew Flug bought 250 S&P Minis first, and then 50 S&P Minis, when in fact it was the other way around—Flug bought 50, then 250; and (b) for the Disputed Trade, instead of an average price in the 1430's—which would have been in accordance with Walrus's limit order for the S&P Minis—CGMI instead executed the order at an average price of 1470.00. Third, the Complaint in paragraph 41 makes clear the time and place of the statements, namely on Monday, August 20, 2007 when Walrus contacted CGMI and disputed the average price for the Disputed Trade and then received the Audit Trail from CGMI on that same day in response.

This sequence of allegations also amply satisfies the test for scienter set forth in Karasyk v. Marc Commodities Corp., 770 F.Supp. 824 (S.D.N.Y. 1991), a CEA § 4(b) case that CGMI cites in its brief. This test asks whether the complaint alleges a statement that "a fact exists or an

event will come to pass coupled with allegations that the fact did not exist or the event did not occur, and circumstances indicating that the statement was false when made". Karasyk at 829-830. Here, Walrus alleges numerous statements that CGMI made in its Audit Trail on August 20, 2007 that clashed with actual events, and that CGMI knew that the statements were false. See Complaint at ¶55.

CGMI contends that the allegation is that "the audit trail and Plaintiff's version of the day's trades 'clashed'", but this contention is meritless. The Complaint at paragraph 43 demonstrates that Walrus's actual allegation is that the Audit Trail clashed with "the actual sequence of events of Friday, August 17, 2007".

Next, CGMI suggests that it could not possibly have committed fraud because CGMI could not have formulated any intent "[d]uring the seconds in which the trade at issue was allegedly entered and confirmed" on August 17, 2007. See CGMI's Memorandum of Law in Support at pp. 5, 10. Again, however, CGMI misreads the Complaint. It is not CGMI's statements of August 17, 2007 that were false. Instead, it is CGMI's statements in the Audit Trail of the following business day, August 20, 2007, that were false. These statements improperly attempted to undo the more favorable execution price, the true price, that CGMI had confirmed to Walrus on August 17th. See Complaint, ¶s 43-46, 52-57.

CGMI cites Kleinberg v. Bear Stearns & Co., 1985 WL 1625, *1 (S.D.N.Y., Jun. 13, 1985), but in fact that case favors Walrus. That case dismissed the complaint at issue for failing to identify trades or their dates, but specifically held that it would give rise to a finding of fraudulent intent if "the trade was accomplished above the prevailing market price". See id. at *4. This is exactly Walrus's allegation in this matter.

Even if the Court were to do as CGMI requests and use the PSLRA heightened pleading standard here, the Complaint would still adequately allege intent, based on several factors. First, as stated in yet another case cited by CGMI, a complaint's pleading that a statement was "consciously false" constitutes circumstantial evidence of conscious misbehavior or recklessness, enough to survive the PSLRA "at least as compelling" test on a Rule 9(b) motion. See Glidepath Holding, B.V. v. Spherion Corp., 2007 WL 2176072, *1, *14-15 (S.D.N.Y., Jul, 26, 2007). This is what Walrus alleges here, that CGMI knowingly made false representations to Walrus.

Second, the Reddy court found persuasive that the defendant had exhibited a "suspicious pattern of trading". Reddy v. CFTC, 191 F.3d 109 at 119 (2d Cir. 1999). In this case, annexed to the Bigelow Affirmation as Exhibit A are two documents that are part of the public record and that demonstrate a pattern of CGMI's behavior similar to the illegal conduct that is the subject of this case. The first document is a Hearing Board Decision from the New York Stock Exchange dated March 24, 2008, finding that "on thousands of occasions" during the period June 2006 to December 2007, CGMI failed to provide certain required data needed to link the entry of orders with reports of execution on the NYSE. While CGMI's deficiency was with respect to the NYSE, rather than the CME, this nevertheless illustrates that CGMI neglected to install controls linking entry of orders to execution reports, in a way that affected thousands of transactions and accounts, over a period of years. These years encompass the month and year when CGMI committed the fraud against Walrus. The second document is a record from the Financial Industry Regulatory Authority ("FINRA") website regarding an enforcement action against CGMI alleging that CGMI "violated just and equitable principles of trade by cancelling an order and transacting it at a different price on a different exchange". In connection with that action, CGMI was censured and paid a monetary fine. This pattern of illegal behaviors similar to the

conduct at issue here makes Walrus's allegation of fraudulent intent more compelling than any nonfraudulent explanation.

The third factor demonstrating that the Complaint would still adequately allege intent, even under the "at least as compelling" standard, is that "if an inference of scienter is at least as compelling as any nonculpable explanation for the defendant's conduct, the tie goes to the plaintiff". City of Brockton Retirement Sys. v. Shaw Group, Inc., 2008 WL 833943, *1, *8 (S.D.N.Y., Mar. 18, 2008)(internal quotes omitted). Here, CGMI imagines several alternative theories to Plaintiff's allegations, but offers no evidence or facts demonstrating that its theories are any more compelling than Plaintiff's, apart from a hazy logical connection between the use of electronic trading and an inference that there had to have been a malfunction in the electronic trading systems. In addition, the theory that trader Andrew Flug erred is less likely than the fraud, since it would be extremely farfetched for Flug to place a limit order at 1439.75, and then to have that order be filled at the highest price of the day for S&P Minis on August 17, 2007. Moreover, another strike against CGMI's theories are that they impermissibly shift the burden of proof, violating the complaint-as-true premise on this motion to dismiss by requiring the Court to "[t]ak[e] the audit trail as the accurate account of the morning trades". See CGMI Memo of Law at p. 13. Therefore, the Court should deny CGMI's motion, no matter what the pleading standard.

2. ***Walrus adequately alleges willful misconduct, in that the essence of the Complaint is CGMI's knowing and intentional action in contravention of Walrus's instructions.***

CGMI contends that Walrus fails to allege "willful misconduct" by CGMI, which would be acting "contrary to Walrus's instructions" and doing so "knowingly and intentionally". See CGMI Memorandum in Support of Motion to Dismiss, p. 14. The Court must reject this contention, however, because the Complaint contains precisely these allegations.

The Complaint states that Walrus entered its instructions for each trade to CGMI through TT, and that on August 17, 2007, Walrus instructed CGMI to buy 250 S&P Minis, at a price no greater than 1439.75. See Complaint, ¶s 18, 34. Next, the Complaint states that CGMI acted contrary to those instructions, by refusing on August 20, 2007 to honor the previous trading day's limit order and instead representing to Walrus that CGMI had executed the trade at an average price of 1470.00. See Complaint, ¶s 45, 52. Finally, the Complaint adequately pleads the "knowing" and "intentional" component. It alleges that CGMI "willfully made or caused to be made to Walrus a false report or statement" of Walrus's orders of August 17th, "willfully deceived or attempted to deceive" Walrus regarding those orders. See Complaint, ¶s 50, 54. Contrary to CGMI's claim on the top of page 15 of its brief, Walrus alleges that CGMI "knew that the representation [of the higher price of 1470.00] was false at the time that [CGMI] made it". See Complaint, ¶55. Thus, as the Court can see, Walrus has pleaded exactly what CGMI has argued must be in the Complaint in order to sustain the fraud claim.

### POINT III
### CGMI BREACHED ITS FIDUCIARY DUTY TO WALRUS

In New York, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary relationship; and (2) a breach of the duty arising from that relationship. Kirk v. Heppt, 532 F.Supp.2d 586, 593 (S.D.N.Y., 2008).

*1.   CGMI had a duty to consummate each transaction in accordance with Walrus's terms and instructions, including the average execution price.*

CGMI argues only that it owed no fiduciary duty to Walrus, and does not address whether its actions would constitute a breach of a fiduciary duty. But CGMI's argument wilts under the holding in all three of its cited cases that—even in a nondiscretionary account—brokers owe their customers a fiduciary duty to consummate the transaction that the customer

15

requests. De Kwiatkowski v. Bear, Stearns & Co., Inc., 306 F.3d 1293, 1302 (2d Cir. 2002)("On a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders"); Press v. Chemical Investment Services Corp., 166 F.3d 529, 536 (2d Cir. 1999)("Given that the relationship between Press and the appellees was limited to the single transaction of purchasing the T-bill, the appellees had the duty to consummate the transaction" and also a duty "to use reasonable efforts to give [Press] information relevant to the affairs that [had] been entrusted to them"); Bissell v. Merrill Lynch & Co., Inc., 937 F.Supp. 237, 246 (S.D.N.Y. 1996)("The scope of affairs entrusted to a broker is generally limited to the completion of a transaction")[6].

Here, Walrus's cause of action stems from a single transaction from August 17, 2007, in which CGMI failed to execute the trade of 250 S&P Minis in accordance with Walrus's instructions. By filling Walrus's limit order of 1439.75 at 1470.00, CGMI breached its fiduciary duty to execute Walrus's order.

**2.      *The CEA does not preempt Walrus's common law claim for breach of fiduciary duty.***

CGMI's only other contention is that all common law claims "the subject matter of which are covered by the CEA" are preempted by the CEA. This contention is meritless, however, in light of the general disfavor of preemption of state law by federal statute or regulation, absent a demonstration that (a) "the nature of the regulated subject matter permits no other conclusion" or (b) "Congress has unmistakably so ordained". Chicago v. N.W. Trans. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981);

Bishop v. Commodity Exchange, Inc., 564 F.Supp. 1557 (S.D.N.Y. 1983) specifically examined the CEA under these two prongs and declined to hold that the CEA preempted the

---

[6] The Court should ignore as inapposite CGMI's other general citations to Muller-Paisner v. TIAA-CREF, 446 F.Supp.2d 221 (S.D.N.Y. 2006) and Maalouf v. Salomon Smith Barney, Inc., 2003 WL 1858153, *1 (S.D.N.Y. 2003), because neither case involved trading of commodities or a dispute with a broker over a single transaction.

plaintiff's state law claims, since Congress had not "unmistakably ordained" that the state law claims were preempted, and also since the CEA provides that "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State". See id. at 1564. The Bishop court also refused to find that the nature of the CEA would permit "no other conclusion" besides preemption, instead holding that there was no reason to assume that Congress "would have opposed the additional deterrent" of plaintiffs exercising their state-conferred rights. See id.

Similarly, the court in Strobl v. New York Mercantile Exchange, 561 F.Supp. 379 (S.D.N.Y. 1983) found the plaintiff's wide array of common law claims not preempted by the CEA, since there was no "congressional intent to preempt all common law claims". See id. at 385.

CGMI's only case in support of its preemption argument is DGM Investments, Inc. v. New York Futures Exchange, Inc., 265 F.Supp.2d 254 (S.D.N.Y. 2003), which is not instructive here, as demonstrated by the earlier decision in that matter, DGM Investments, Inc. v. New York Futures Exchange, Inc., 2002 WL 31356362, *1, *5 (S.D.N.Y., Oct. 17, 2002), which details the court's specific reasons for preemption. Unlike this matter, the claims at issue in DGM depended on "allegations that the NYFE, NYCC, NYBOT, and their directors, officers, committee members, and employees failed to fulfill their obligation to regulate the market in P-Tech Futures and Options". Id. The court found that the CEA preempted these because the "application of state law would directly affect trading on or the operation of a futures market". Id. Contrary to CGMI's argument, it does not follow that *all* improper actions "relating to" commodities are "within the purview of the CEA and thus preempted"[7]. In fact, DGM expressly

---

[7] See CGMI's Memorandum of Law in Support, p. 15.

states otherwise, distinguishing as unworthy of preemption, any claim with "little or no bearing upon the actual operation of the commodity futures markets". See id.

### POINT IV
### WALRUS CONSENTS TO DISMISSAL OF THE NEGLIGENCE CLAIM

Walrus hereby consents to the dismissal of its negligence claim.

### CONCLUSION

Conceding most elements of Walrus's claims, CGMI's challenges rely on the following:

- an inapplicable pleading standard designed to curtail filings of, and abuses under, securities fraud cases under §10(b) of the Securities Exchange Act of 1934;

- an improper attempt to reframe the Complaint's allegations about the fraudulent statements (to make it appear that Walrus attacks CGMI's the split-second confirmation of August 17th, rather than the subsequent price misrepresentations);

- the breezing over the Complaint's express allegations that CGMI acted "knowingly" and contrary to instructions;

- three cited cases about lack of fiduciary duty, all of which state elsewhere that brokers *do* owe customers a duty to execute each transaction competently and diligently; and

- a single case that preempted common law claims leveled at futures exchanges and their directors and employees, which case—unlike this one—would have directly affected trading on or the operation of a futures market.

The Court should disregard all of these flimsy challenges, and deny CGMI's motion.

DATED:   New York, New York
         May 20, 2008

_____
Francis Bigelow (FB-8749)